

**NUMBER 13-10-033-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**JESUS GARCIA JR.,**                                                   **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                            **Appellee.**

**On appeal from the 105th District Court
of Nueces County, Texas.**

# MEMORANDUM OPINION

**Before Justices Garza, Vela, and Perkes
Memorandum Opinion by Justice Vela**

Following a gang-related shooting that killed Danny Villarreal and wounded six-year-old T.R., a jury convicted appellant, Jesus Garcia Jr., of murder (count 1), engaging in organized criminal activity-murder (count 2), aggravated assault (count 3), and engaging in organized criminal activity-aggravated assault (count 4). *See* TEX. PENAL CODE ANN. § 19.02(b) (West 2003), § 22.02 (West Supp. 2010), § 71.02(a) (West

Supp. 2010). The jury assessed prison sentences of fifty-five years, fifty years, twenty years, and twenty years, respectively.[1] The jury also assessed a $10,000 fine for each conviction. In two issues, appellant argues he received ineffective assistance of counsel, and he challenges the sufficiency of the evidence to support his convictions. We affirm.

## I. FACTUAL BACKGROUND

### A. State's Evidence

Edward Morales,[2] who joined the Mexican Mafia in 1987, testified that on July 25, 2008, he met with Humberto Garcia,[3] Anthony Gonzales, and appellant in the backyard of appellant's home to plan Danny Villarreal's murder. Morales identified appellant as the one who gave the "orders" to do the "hit."[4] When asked "[w]hat did he [appellant] tell you?", Morales said, "That we were supposed to go do this hit, if anything went wrong that I was supposed to take the wrap [sic]." Appellant said the plan called for him "and about 13 others,"[5] to look for Villarreal.

That afternoon, several Mexican Mafia members, including Morales and Humberto Garcia, arrived outside of a home on Segrest Street in Corpus Christi. The men had

---

[1]These sentences are to run concurrently.

[2]In exchange for his testimony, Edward Morales received a twenty-year prison sentence for his role in Danny Villarreal's murder.

[3]The evidence showed Humberto Garcia was a sergeant in the Mexican Mafia.

[4]At the prosecutor's request, the trial court allowed the record to reflect that Morales had identified appellant, who was seated at counsel table.

[5]When the prosecutor asked Edward Morales to give their names, he said, "Eriberto Mendez, Humberto Garcia, Joe Angel Madero, Jose Olvera, Anthony Gonzales, a person nicknamed "Guero," and another person nicknamed "Gordo." He did not know the names of the other persons involved in the shooting. Later, during his direct-examination, Morales identified Gabriel Castillo as being present during the shooting.

2

several firearms, including a shotgun.  When Humberto Garcia signaled, everybody outside the house started shooting at it.   At that time, Villarreal, Christina Cyr, and her three children were inside the house.   Villarreal was shot and killed, and Cyr's six-year-old son, T.R., and two-year-old son, D.V., were wounded.   Morales testified that appellant was a Mexican Mafia captain, but did not place him at the scene of this shooting.

Conrado Castillo[6] joined the Mexican Mafia in 1996 and knew appellant as a Mexican Mafia captain.   On the day after the shooting, several Mexican Mafia members, including appellant, met at Castillo's house.   Castillo testified that during the meeting, a person whom he knew as "Alex" asked appellant, "'Hey, well did you know that it's against the rules and regulations of the Mexican Mafia to shoot, . . . innocent people or kids, especially kids?'"   Castillo testified that in answer to this question, "[T]hey said, all of them, Tiny [appellant], Ghost [Anthony Gonzales] and Bird [Humberto Garcia] . . . said, 'Hey, well, we had no choice.   He shot first from the house so, . . . we had to do what we had to do.'"

At trial, the prosecutor asked Castillo "If the Mexican Mafia locally wants to put a hit on somebody or assassinate someone, can somebody who's not a ranking officer order it?," Castillo replied "He can order it, but it won't get done unless the captain says." Castillo also testified that appellant talked to him about ordering the "hit," and that was how Castillo was aware that appellant was involved in the shooting.   Castillo testified he knew from talking to appellant and the other gang members that appellant was not at the

---

[6]At the time of trial, Conrado Castillo had a sentencing hearing pending in federal court for possession of "drugs."   In exchange for testifying against appellant, the prosecutor formerly in charge of appellant's case agreed to "send a letter or tell the Federal people that [Castillo was] cooperating with" the State.

3

Segrest shooting.

**B.  Defense Evidence**

Appellant's wife, JoAnn Garcia, testified that she and appellant were at home on the day of the shooting and that they learned about it by watching the local news.   She stated that on that date, no one came to their home.

Appellant's son, J.G., testified he was at home with his parents on July 25, 2008. On that day, he recalled seeing the news on television and "saw a glimpse" of "[t]he house with all the bullet holes in it."   On cross-examination, when the prosecutor asked J.G., "[Y]ou really don't know everything he's [appellant] doing while he's there at the house even though he's there at home, right?", he said, "No, sir."

Appellant took the stand in his own defense.   He testified that while incarcerated for burglary of a habitation, "I first encountered . . . communication with the Mexican Mafia."   When defense counsel asked him, "And have you ever been a member [of the Mexican Mafia]?," he said, "No, sir."   Explaining a tattoo on his body, he stated that "it's Orgullo Mexicano . . . with the 5, 13, 5."   He said that at the time he got the tattoo, "I did not know what 5, 13, 5 meant and I really didn't know that the 'K' symbolized only for the Mexican Mafia."   He also testified that "the whole reason behind the tattoo was the Orgullo Mexicano . . . part of which is the Mexican pride.   I didn't know that the 5 was the symbol for 'e', 13 was the 'm' and 'e'.   I didn't even know that you could spell the letter 'm' like that, and then 'K' it only signifies for them."   He stated that a Mexican Mafia member "suggested" that I "cover it [the tattoo] up" because "it's not like I'm a member" of the Mexican Mafia.   Appellant followed the suggestion and had the tattoo covered up.

4

Appellant testified that on the date in question, no one, including Edward Morales, came by his house to visit him. When defense counsel asked appellant, "[I]s there any truth to what he [Morales] represented to this jury?", he said, "None." He also stated that Conrado Castillo's testimony was "not true." However, when defense counsel asked appellant, "Was there a time where you actually acknowledged being esquina . . . or esquina firme [in the Mexican Mafia]?," he said, "Yes, sir."

On cross-examination, when the prosecutor asked appellant, "And you said while in prison you were esquina?," he said, "Esquina firme, sir, that's right." When asked what "esquina firme" meant, appellant said, "[T]hat means you're just a member they [the Mexican Mafia] can count on." In explaining how he got the "5, 13, 5 tattooed on" his body, he stated he "picked out this tattoo . . . out of a picture album . . . although I just wanted the Orgullo Mexicano, it came with the bullets and the 5, 13, 5. . . . Never did I think again that it symbolized the spelling of the word eme[.]"[7] When the prosecutor asked him, "You also have tattoos that resemble a lot of the tattoos that Mexican Mafia members use, correct?", he said, "That's right."

## C.  State's Rebuttal

Aaron Garcia, a parole-gang officer for the Texas Department of Criminal Justice, Parole Division, testified the Mexican Mafia likes to use the bullets of the "bandolero" as one of its tattoos. He stated that appellant's tattoo "does have 13 bullets which signify the 13th letter of the alphabet which is 'm'."

Officer Milo Loa testified that Corpus Christi Police Chief Bryan Smith "had been threatened due to some remarks he made" following the Segrest shooting. Afterwards,

---

[7]The numbers "5, 13, 5" relate to the fifth, thirteenth, and fifth letters of the alphabet, or "eme." The letters "eme" are a symbol used by the Mexican Mafia.

Officer Loa and FBI agent Bill Cassidy went to appellant's home and told him that because of his "standing in the gang being a ranking member, that nothing in this town happened without his approval or his knowledge, that if anything happened to the Chief that the full weight of the Federal Government and the Police Department would use every legal resource to dismantle this organization."

On cross-examination, when defense counsel asked Officer Loa, "[W]hose decision was it to take the position, . . . that [appellant] was a member of the Mexican Mafia and a ranking captain?", he said, "I think that's common knowledge within the police department and law enforcement agencies." He stated that "everything that I read, FBI reports indicate—interviews, debriefs of defendants, everything indicates that he is not an esquina, that he is a documented ranking member in the Mexican Mafia."

## II. DISCUSSION

### A. Sufficiency of the Evidence

We address issue two first wherein appellant challenges the sufficiency of the evidence to support his convictions. He argues that because the State relied on the uncorroborated testimony of two accomplice witnesses, Morales and Castillo, the evidence is insufficient to support his convictions.

#### The Accomplice-Witness Rule

In *Smith v. State*, the court of criminal appeals stated that, "under Texas Code of Criminal Procedure Article 38.14, a conviction cannot stand on an accomplice witness's testimony unless the testimony is corroborated by other, non-accomplice evidence that tends to connect the accused to the offense." 332 S.W.3d 425, 439 (Tex. Crim. App. 2011) (citing TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005)). "An accomplice is a

person who participates in the offense before, during, or after its commission with the requisite mental state." *Id.* (citing *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007)). "Presence at the crime scene does not make a person an accomplice; an accomplice must have engaged in an affirmative act that promotes the commission of the offense that the accused committed." *Id.* (citing *Druery*, 225 S.W.3d at 498). "A person is not an accomplice if the person knew about the offense and failed to disclose it or helped the accused conceal it." *Id.* (citing *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987)); *Druery,* 225 S.W.3d at 498; *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). "A witness who is indicted for the same offense or a lesser-included offense as the accused is an accomplice as a matter of law." *Id.* (*Cocke*, 201 S.W.3d at 748).

Here, it is undisputed that Morales, who participated in the crimes and who subsequently pleaded guilty for his participation in accordance with a plea agreement, is an accomplice. *See id.* (stating that "[a]n accomplice is a person who participates in the offense before, during, or after its commission with the requisite mental state.") (citing *Druery*, 225 S.W.3d at 498). Thus, for the convictions to rest upon his testimony, "'there must simply be *some* non-accomplice evidence which *tends* to connect appellant to the commission of the offense alleged in the indictment.'" *Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App.2008) (quoting *McDuff v. State*, 939 S.W.2d 607, 613 (Tex. Crim. App. 1997)) (emphasis in original).

7

Appellant argues that any such corroboration is lacking because Conrado Castillo is also an accomplice witness. We disagree. Morales testified that after he was shot[8] at the scene of the shooting outside Cyr's home, he told the police that Conrado Castillo was there, too. However, on direct examination, when the prosecutor asked Morales, "Were you mistaken about that [Castillo being at the scene of the shooting]?", he said, "Yes, sir." He testified that the person who was at the shooting was not Conrado Castillo, but Conrado's brother, Gabriel Castillo.

Conrado testified he knew nothing about the shooting until after it happened. Thus, Conrado is not an accomplice witness because he did not participate "in the offense before, during, or after its commission with the requisite mental state." *See Smith*, 332 S.W.3d at 439 (citing *Druery*, 225 S.W.3d at 498); *Cocke,* 201 S.W.3d at 747. Even though Conrado testified he met with appellant the day after the shooting, this does not make him an accomplice because he had not "engaged in an affirmative act that promotes the commission of the offense that the accused committed." *Id.* (citing *Druery*, 225 S.W.3d at 498). Furthermore, the record does not show he was indicted for the same offenses or any lesser-included offenses as appellant.

**Sufficiency of the Non-Accomplice Evidence**

"When reviewing the sufficiency of non-accomplice evidence under Article 38.14, we decide whether the inculpatory evidence tends to connect the accused to the commission of the offense." *Id.* at 442 (citing *Brown v. State*, 672 S.W.2d 487, 488 (Tex. Crim. App. 1984)). "The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case." *Id.* (citing *Reed v. State*, 744

---

[8]Edward Morales testified that after he turned around to leave the scene of the Segrest shooting, he got shot. While recovering from this wound, he told police investigators he did not know who gave the order to kill Villarreal. However, he also testified he told them this "because I was scared."

8

S.W.2d 112, 126 (Tex. Crim. App. 1988)). "The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense." *Id.* (citing *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009); *Reed*, 744 S.W.2d at 126)). "[I]t is not appropriate for appellate courts to independently construe the non-accomplice evidence." *Id.* (citing *Simmons*, 282 S.W.3d at 508). Instead, we are required "to consider the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense." *Id.* (citing *Mitchell v. State*, 650 S.W.2d 801, 807 (Tex. Crim. App. 1983)).

Here, to satisfy article 38.14, the State relied on the following non-accomplice testimony: (1) testimony that appellant is a ranking member of the Mexican Mafia; (2) shortly after the Segrest Street shooting, appellant and other Mexican Mafia members met at Conrado Castillo's home, where "Alex" questioned appellant about the shooting; and (3) Conrado Castillo's testimony that appellant told him that he ordered the "hit." Our court of criminal appeals has held that "under most circumstances, an admission or confession will be sufficient to corroborate the accomplice-witness testimony." *Brown*, 270 S.W.3d at 568; *Jackson v. State*, 516 S.W.2d 167, 171 (Tex. Crim. App. 1974) (stating "[i]t is well established that [a defendant's] admission or confession, under most circumstances, will be sufficient to corroborate the accomplice witness."); *see also* *Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007) (stating that a defendant's "admission that he participated in the crime, although he denied being a shooter, is enough to tend to connect him to the offense."). After considering the combined force of all of the non-accomplice evidence that tends to connect the accused to the offense, we

9

hold the evidence is sufficient to tend to connect appellant to the offenses for which he was convicted.

**Standard of Review**

"When reviewing a case for legal sufficiency, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Winfrey v. State*, 323 S.W.3d 875, 878-79 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Accordingly, "we 'determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict.'" *Id.* at 879 (quoting *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (citing *Hooper v. State*, 214 S.W.3d 9, 16-17 (Tex. Crim. App. 2007)). "It has been said quite appropriately, that '[t]he appellate scales are supposed to be weighted in favor of upholding a trial court's judgment of conviction, and this weighting includes, for example, the highly deferential standard of review for legal-sufficiency claims.'" *Id.* (quoting *Haynes v. State*, 273 S.W.3d 183, 195 (Tex. Crim. App. 2008) (Keller J., dissenting) (citing *Jackson*, 443 U.S. at 319)). "We must therefore determine whether the evidence presented to the jury, viewed in the light most favorable to the verdict, proves beyond a reasonable doubt that appellant" committed the crimes for which the jury found him guilty. *See id.* "It is the obligation and responsibility of appellate courts 'to ensure that the evidence presented actually supports a conclusion that the defendant committed the crime that was charged.'" *Id.* at 882 (quoting *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)). In addition, "'[i]f the evidence at trial raises only a suspicion of guilt, even a strong one, then that evidence is insufficient [to

10

convict].'"  *Id.* (quoting *Urbano v. State*, 837 S.W.2d 114, 116 (Tex. Crim. App. 1992)), *superseded in part on other grounds*, *Herrin v. State*, 125 S.W.3d 436, 443 (Tex. Crim. App. 2002).

### 1. Engaging in Organized Criminal Activity-—Murder

A person commits the offense of engaging in organized criminal activity "if, with the intent to establish, maintain, or participate . . . as a member of a criminal street gang, the person commits or conspires to commit . . . (1) murder[.]"  TEX. PENAL CODE ANN. § 71.02(a)-(a)(1) (West Supp. 2010).   Section 71.01(d) defines a "criminal street gang" as "three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities."  *Id.* § 71.01(d) (West 2003).   "Conspires to commit" means that:

> a person agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense and that person and one or more of them perform an overt act in pursuance of the agreement. An agreement constituting conspiring to commit may be inferred from the acts of the parties.

*Id.* § 71.01(b).

A person commits murder "if he:   (1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; . . . ."  *Id.* § 19.02(b)(1), (2).   Murder is a "result of conduct" offense, which means that the culpable mental state relates to the result of the conduct, the causing of the death.  *Schroeder v. State*, 123 S.W.3d 398, 400 (Tex. Crim. App. 2003).

"A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the

11

conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2003). "A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result." *Id.* § 6.03(b). A person's knowledge and intent may be inferred from the "acts, words, and conduct of the accused." *Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). Intent to kill may be inferred from the use of a deadly weapon. *Hardesty v. State*, 825 S.W.2d 746, 749 (Tex. App.–Houston [14th Dist.] 1992, pet. ref'd).

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both". TEX. PENAL CODE ANN. 7.01(a) (West 2003). "A person is criminally responsible for an offense committed by the conduct of another if: (1) acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; . . . ." *Id.* 7.02(a)(2).

**2. Analysis**

*a. Sufficiency of the Evidence to Support Appellant's Intent to Participate as a Member of a Criminal Street Gang*

Aaron Garcia, the parole-gang officer for the Texas Department of Criminal Justice, testified the Mexican Mafia has a ranking structure starting at president and descending to vice-president, generals, captains, lieutenants, sergeants, soldiers, and esquinas. He is familiar with the Mexican Mafia's rules and regulations and said the Mexican Mafia is a "criminal organization" involved in "anything illegal to include extortion, murder, anything to get money to advance the Mexican Mafia, . . . ." Garcia knew appellant and confirmed him as a Mexican Mafia member because he "has some tattoos

12

on him that represent being a member of the Mexican Mafia." He said that appellant has "tattoos of 'Orgullo Mexicano,' . . . which means 'Proud Mexican' [a]nd only members of the Mexican Mafia can use this tattoo, . . . ." He also testified appellant had the tattoos of the numbers 5, 13, and 5, "and only a modified member can have that tattoo."

Edward Morales testified appellant is a Mexican Mafia captain, who is in charge of the Mexican Mafia in Corpus Christi. He stated that as a captain, appellant gave all of the orders. In addition, Morales's testimony showed that the Mexican Mafia members in Corpus Christi are involved in "[a]ny criminal activity you can think of," including drug dealing, prostitution, money laundering, extortion, and murder. He testified that while acting as a Mexican Mafia captain, appellant ordered the murder of Villarreal. Thus, a rational jury could conclude that appellant was a member of a criminal street gang at the time of Villarreal's murder. *See* TEX. PENAL CODE ANN. 71.01(d) (defining criminal street gang as three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities).

### b. Sufficiency of the Evidence to Show Appellant Murdered Villarreal

A rational jury could have determined the following from the evidence: (1) appellant, while acting as a Mexican Mafia captain, had a meeting with other Mexican Mafia members during which they planned Villarreal's murder; (2) at that meeting, appellant ordered Villarreal's murder; (3) after the meeting, Humberto Garcia, Morales and other Mexican Mafia members shot at Cyr's house, killing Villarreal; and (4) appellant

13

had a motive to have Villarreal killed.[9]

The contrary evidence showed: (1) on the day of the murder, no one came to appellant's house; (2) appellant had no involvement in Villarreal's murder; and (3) appellant was not a Mexican Mafia member, much less a captain therein.

### c. Sufficiency of the Evidence to Show Appellant Conspired to Murder Villarreal

A rational jury could infer from the evidence that appellant agreed with one or more of the Mexican Mafia members to engage in conduct that would constitute the offense of murder. A rational jury could also infer that one or more of these members performed an overt act in pursuance of the agreement. *See id.* 71.01(b) (defining "conspires to commit" as a person agreeing with one or more persons that any one of them engage in conduct constituting the offense and one of them performing an overt act in pursuance of the agreement).

Viewing all of the evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient for a rational jury to find beyond a reasonable doubt that appellant engaged in the offense of organized criminal activity because "with the intent to establish, maintain, or participate . . . as a member of a criminal street gang," he conspired to commit the murder of Villarreal. Viewing all of the evidence in the light most favorable to the verdict, we also hold the evidence is legally sufficient for a rational jury to find beyond a reasonable doubt that appellant, acting as party, intentionally or knowingly caused the death of Villarreal.

---

[9]Edward Morales testified appellant gave the order to kill Danny Villarreal because "an ex-member of the Mexican Mafia shot at some members of the Mexican Mafia."

14

### 3. Engaging in Organized Criminal Activity—Aggravated Assault.

A person commits the offense of engaging in organized criminal activity if, with the intent to establish, maintain, or participate . . . as a member of a criminal street gang, the person commits or conspires to commit . . . aggravated assault[.]" TEX. PENAL CODE ANN. 71.02(a)-(a)(1). The Texas Legislature has defined the crime of assault in section 22.01 of the penal code. Subsection (a) of that provision sets out three separate and distinct assaultive crimes, one of which is relevant to the present discussion: "(a) A person commits an offense if the person: (1) Intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse[.]" *Id.* § 22.01(a)(1) (West Supp. 2010). "Subsection (1)—'bodily injury' assault is a result-oriented assaultive offense. . . ." *Landrian v. State*, 268 S.W.3d 532, 536 (Tex. Crim. App. 2008). "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." TEX. PENAL CODE ANN. § 1.07(a)(7) (West Supp. 2010).

Section 22.02 of the penal code defines the crime of aggravated assault as being an assault under section 22.01, and the person "(1) causes serious bodily injury to another, including the person's spouse; or (2) uses or exhibits a deadly weapon during the commission of the assault." *Id.* § 22.02. Thus, "the use of a deadly weapon may act as an aggravating factor for 'bodily injury' assault under Section 22.01(a)(1), . . . ." *Landrian*, 268 S.W.3d at 537. A shotgun qualifies as a deadly weapon per se. *Dominguez v. State*, 125 S.W.3d 755, 761 (Tex. App.–Houston [1st Dist] 2003, pet. ref'd).

Section 7.02(b) of the penal code provides:

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty

15

of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE ANN. § 7.02(b). Therefore, the jury may convict appellant of the aggravated assault of T.R. as a party to the offense if the jury found that: (1) he conspired with the other Mexican Mafia members to commit Villarreal's murder; (2) the aggravated assault occurred in furtherance of the murder; and (3) he should have anticipated the aggravated assault of T.R. as a result of carrying out of the murder conspiracy. *See Ex parte Martinez*, 330 S.W.3d 891, 902 (Tex. Crim. App. 2011); *Ex parte Thompson*, 179 S.W.3d 549, 552 (Tex. Crim. App. 2005).

Here, the evidence against appellant, in its totality, would support a jury finding that he was a party to the offense of T.R.'s aggravated assault. There was evidence that: (1) shortly before the shooting, appellant met with his fellow gang members; (2) during this meeting, appellant planned Villarreal's murder with these gang members and ordered the "hit"; (3) acting on appellant's order, Mexican Mafia members went to Cyr's home and indiscriminately opened fire at it in an attempt to kill Villarreal; (4) during this shooting, T.R., who was inside the house, was wounded by shotgun pellets; (5) T.R. had surgery to remove the pellets[10]; and (6) evidence showed appellant, at the time of the shooting, was a captain in the Mexican Mafia and that the gang engaged in murder as well as other crimes.

Even though appellant was not present during the shooting of either T.R. or Villarreal, we point out that in order to convict him of aggravated assault, the State did not

---

[10]Christina Cyr testified, "They had to cut into his [T.R.'s] skull to remove the pellets."

16

have to prove that he personally shot either victim. Rather, the State merely had to prove he was acting with others in the commission of Villarreal's murder, that the aggravated assault was committed in furtherance of Villarreal's murder, and that appellant should have anticipated that the aggravated assault of another person present at the scene could be the result of Villarreal's murder. It is reasonable to infer that when a gang leader such as appellant orders fellow gang members to murder someone, he or she should anticipate that the gang members who he or she ordered to commit the murder might shoot another during the attempt to murder the intended victim.

We hold that a rational jury could reasonably conclude that appellant should have anticipated the aggravated assault on T.R. as a result of carrying out the agreement to murder Villarreal. Viewing all of the evidence in the light most favorable to the verdict, we hold the evidence is legally sufficient for a rational jury to find beyond a reasonable doubt that appellant engaged in the offense of engaging in organized criminal activity because, "with the intent to establish, maintain, or participate . . . as a member of a criminal street gang," he conspired to commit the aggravated assault. Viewing all of the evidence in the light most favorable to the verdict, we also hold the evidence is legally sufficient for a rational jury to find beyond a reasonable doubt that appellant, acting as a party, intentionally, knowingly, or recklessly caused bodily injury to T.R. by shooting him with a firearm. Issue two is overruled.

17

**B. Ineffective Assistance of Counsel**

In issue one, appellant argues he received ineffective assistance of counsel.

**Standard of Review**

"A defendant has a Sixth Amendment right to effective assistance of counsel,"[11] and counsel's "function 'is to make the adversarial testing process work in the particular case.'" *Ex parte Martinez*, 330 S.W.3d at 900 (quoting *Strickland v. Washington*, 466 U.S. 668, 690 (1984)). "To obtain a reversal of a conviction under the *Strickland* test, a defendant must show that: (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or fundamentally unfair outcome of the proceeding." *Davis v. State*, 278 S.W.3d 346, 352 (Tex. Crim. App. 2009) (citing *Strickland*, 466 U.S. at 687). "Deficient performance means that 'counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" *Ex parte Napper*, 322 S.W.3d 202, 246 (Tex. Crim. App. 2010) (quoting *Strickland*, 466 U.S. at 687). "To establish deficient performance, 'the defendant must show that counsel's representation fell below an objective standard of reasonableness.'" *Id.* (quoting *Strickland*, 466 U.S. at 688). "The prejudice prong of *Strickland* requires showing 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* at 248 (quoting *Strickland*, 466 U.S. at 694). "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "It is not enough that counsel's errors could have had 'some conceivable effect on the outcome of the proceeding,' but a

---

[11] *Ex parte Martinez*, 330 S.W.3d 891, 900 (Tex. Crim. App. 2011) (citing U.S. CONST. amend. VI).

18

defendant does not have to show that counsel's deficient conduct 'more likely than not altered the outcome of the case.'"  *Id.* at 248-49 (quoting *Strickland*, 466 U.S. at 693). "This usual standard for showing prejudice is not always sufficient, however.  If the proceeding was 'rendered neither unreliable nor fundamentally unfair' by counsel's deficient performance, then the prejudice question can be answered in the negative to prevent the defendant from obtaining a 'windfall.'"  *Id.* at 249 (quoting *Lockhart v. Fretwell*, 506 U.S. 364, 366 (1993)).  "[E]ach case must be judged on its own unique facts."  *Davis*, 278 S.W.3d at 353.

### 1. Actual Conflict of Interest

Appellant argues defense counsel was ineffective because of an actual conflict of interest stemming from prior actions with the 148th District Court.

### a. Procedural History

Appellant's case was originally set for trial in the 148th District Court, Judge Marisela Saldana presiding.  After appellant's defense counsel finished general voir dire in appellant's case, Judge Saldana held an in-camera hearing during which she announced that in the afternoon before voir dire began in appellant's case, appellant's defense counsel called her at home and requested a face-to-face meeting with her.  He told her the matter was "urgent" and "personal."  The two met at Barnes & Noble, where defense counsel told her that he had concerns about his friend,[12] who might have suicidal ideations and was dating a woman who was not "beneficial" for the friend.  Based upon what Judge Saldana "heard" on the morning of voir dire in appellant's case as well as

---

[12]Judge Saldana gave the name of defense counsel's friend; however, for reason of confidentiality, we will not mention the friend's name.

defense counsel's "maneuvering" to postpone the trial, she became concerned about his "motive" for contacting her. She told defense counsel she was going to report him to the "State Bar" and that because "this contact taints trial of this case," she was going to transfer the case to another court. After the hearing, Judge Saldana dismissed the jury panel.

The case was transferred to the 105th District Court, and after appellant was convicted, his appellate counsel filed a motion for new trial, alleging ineffective assistance of counsel. The trial court held a hearing on the motion, during which Inna Rogoff, an assistant district attorney, testified that: (1) she attended the meeting with Judge Saldana and defense counsel at Barnes & Noble; (2) when defense counsel arrived for the meeting, he was holding a "pretty thick" magazine; (3) defense counsel "appeared to be very nervous with" her presence; (4) when Judge Saldana reached for the magazine, defense counsel either "grabbed it out of her hands" or "appeared" to do so; and (5) he took the magazine with him when he went to get coffee. Rogoff testified that "[i]t did appear that something was stuffed into the magazine." She said that Judge Saldana and defense counsel engaged in conversation that had nothing to do with appellant's case.

### b. Applicable Law and Analysis

The Sixth Amendment guarantees the right to reasonably effective assistance of counsel, which includes the right to "conflict-free" representation. *See Strickland*, 466 U.S. at 687, 692; *Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980). "An 'actual conflict of interest' exists if counsel is required to make a choice between advancing his client's

20

interest in a fair trial or advancing other interests (perhaps his own) to the detriment of his client's interest." *Ex parte Morrow*, 952 S.W.2d 530, 538 (Tex. Crim. App. 1997). *See Acosta v. State*, 233 S.W.3d 349, 356 (Tex. Crim. App. 2007). In order for a defendant to establish a violation of his right to the reasonably effective assistance of counsel based on a conflict of interest, "he must show (1) that defense counsel was actively representing conflicting interests, and (2) that the conflict had an adverse effect on specific instances of counsel's performance." *Id.* (citing *Cuyler v. Sullivan*, 446 U.S. 335 (1980)). *See Acosta*, 233 S.W.3d at 356 (holding that *Cuyler* standard is proper standard to analyze claims of ineffective assistance because of conflict of interest).

"[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. 349-50. "But until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Id.* at 350. In *Cuyler*, the Supreme Court held that "the possibility of conflict is insufficient to impugn a criminal conviction. In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 350.

In this case, appellant argues that defense counsel's "behavior on the eve of trial in the 148th District Court can only be classified as a failed attempt to bribe Judge Saldana." We disagree. The record contains no evidence to support the argument that defense counsel ever tried to bribe Judge Saldana. Furthermore, Rogoff testified that the conversation between Judge Saldana and defense counsel had nothing to do with

21

appellant's case.  A conversation between a judge and a defense attorney, who is representing a criminal client before the judge, that is unrelated to the client's case, does not alone mean that counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests to the detriment of his client's interest. *See Ex parte Morrow*, 952 S.W.2d at 538.   More is required before it can be said that a conflict actually exists.   *See Acosta*, 233 S.W.3d at 355.   We therefore conclude that any conflict of interest in this case is merely speculative and thus cannot support an ineffective assistance claim.   *See Cuyler*, 446 U.S. at 350.   We hold that because appellant cannot establish the "constitutional predicate" that his defense counsel "actually represented conflicting interests," he cannot show that his counsel rendered ineffective assistance.   *See Cuyler*, 446 U.S. at 349-50.

**2. Failure to Investigate and Interview Exculpatory Witnesses**

**a. Applicable Law**

One of defense "counsel's duties is that of making an independent investigation of the facts of his client's case."   *Butler v. State*, 716 S.W.2d 48, 54 (Tex. Crim. App. 1986). This means "counsel has the responsibility to seek out and interview potential witnesses." *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990).   A failure to seek out and interview potential witnesses "'is to be ineffective, if not incompetent, where the result is that any viable defense available to the accused is not advanced.'"   *Butler*, 716 S.W.2d at 54 (quoting *Ex parte Lilly*, 656 S.W.2d 490 (Tex. Crim. App. 1983)).   "[A] claim for ineffective assistance based on trial counsel's failure to interview a witness cannot succeed absent a showing of what the interview would have revealed that reasonably

22

could have changed the result of the case." *Stokes v. State*, 298 S.W.3d 428, 432 (Tex. App.–Houston [14th Dist.] 2009, pet. ref'd).

### b. Background

Defense counsel did not testify during the hearing on the motion for new trial. However, at this hearing, the trial court admitted defense counsel's affidavit in which he stated, in relevant part, that "other than alibi witnesses I did not direct or attempt to seek out and interview other potential witnesses in an effort to uncover additional evidence that might corroborate or exculpate [appellant], or impeach the State's two primary witnesses."

Defense counsel employed Leopoldo Sanchez to investigate appellant's case. During the new-trial hearing, Sanchez testified he and defense counsel talked about interviewing "some witnesses," but Sanchez could not remember their names. Sanchez "reviewed and analyzed all the videotaped statements by the State's witnesses" and said that Edward Morales and Conrado Castillo mentioned the names of many individuals who were involved in some capacity with this case. Sanchez was able to ascertain the names of seventeen potential witnesses,[13] all of whom he knew as alleged members of the Mexican Mafia. He said that defense counsel did not ask him to interview them. Sanchez testified that "I know now that Rudy Castro and Joe Madero [two of the seventeen potential witnesses], had they been contacted . . . or interviewed prior to [appellant's trial], . . . would have been willing to testify at his trial now."

---

[13] These people were Gilbert Castro, Joe Maranado, David Macada, Gilbert Garcia, Raul Benavides, Jason Prado, Jimmy Salinas, Jose Olvera, Randy Ramirez, Edward Morales, Rudy Castro, Humberto Garcia, Anthony Gonzales, Joe Madero, Eriberto Mendez, Reynaldo Castillo, and Jody Acosta.

23

At the new-trial hearing, Castro and Madero appeared in court. Both of them announced that they did not want to testify on appellant's behalf. Nevertheless, the amended motion for new trial included Castro's affidavit in which he stated that he was one of the persons who shot at the home on Segrest Street. As a result, he pleaded guilty[14] in exchange for a thirty-year prison sentence. He stated that if someone from appellant's attorney's office had asked him to testify as a witness for appellant, he would have testified:

> 1. That the State's witness [Edward] Morales had perjured himself when he testified that [appellant] was the person who had ordered Raul Valencia to be killed when in fact it was Anthony Gonzales a/k/a "Ghost" who had ordered me and others to kill Raul Valencia in retaliation for shooting at other members of our gang.

> 2. That the State's witness [Edward] Morales had perjured himself when he testified that he got shot by other members of our gang when in fact he got shot by someone inside victim Daniel Villarreal's house as he and I attempted to break and enter victim Danny Villarreal's house to kill Raul Valencia.

**c. Analysis**

Appellant argues defense counsel was ineffective for failing "to interview or even contact witnesses who may have exculpated" him at trial. Because "[t]he two prongs of *Strickland* need not be analyzed in a particular order,"[15] we decide whether appellant satisfied the prejudice prong,[16] which requires us to "ask whether there is a reasonable probability that the jury would have had a reasonable doubt as to [a]ppellant's guilt had . . . [the seventeen potential witnesses] appeared at trial. . . ." *Perez v. State,* 310 S.W.3d

---

[14]Castro did not say what crime he pleaded guilty to.

[15]*Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011).

[16]*See Strickland v. Washington*, 466 U.S. 668, 697 (1984).

24

890, 894 (Tex. Crim. App. 2010). In *Perez*, the court of criminal appeals followed the guidance of *King v. State*, 649 S.W.2d 42 (Tex. Crim. App. 1983), in which the defendant "asserted ineffective assistance of counsel in part because no witnesses testified on his behalf." *Perez*, 310 S.W.3d at 894 (citing *King*, 649 S.W.2d at 44). The *Perez* court, quoting from *King*, stated that "the 'failure to call witnesses at the guilt-innocence and punishment stages is irrelevant absent a showing that such witnesses were available and appellant would benefit from their testimony.'" *Id.* (quoting *King*, 649 S.W.2d at 44).

Here, during the guilt-innocence stage, defense counsel called witnesses who testified on appellant's behalf. In his affidavit, Castro stated he was available to testify for appellant that Morales perjured himself when he testified that appellant ordered Valencia's murder. However, this case involved the murder of Danny Villarreal, not Valencia. Morales testified that appellant ordered Villarreal's murder.

Castro also stated he was available to testify that Morales had perjured himself when he testified that he got shot by other gang members when in fact, he got shot by someone inside the home in which Villarreal was killed. Morales testified that while outside the Segrest home, he got shot. He did not see who shot him but believed, based on "rumors," that one of the other gang members shot him. Cyr, who was inside the house during the shooting, testified that no shots were fired from inside the house. In addition, a police investigator found no evidence to show that someone fired shots from inside the house.

Thus, we do not see a reasonable probability that Castro's testimony would have changed the result of appellant's trial. With regard to the other sixteen potential

25

witnesses, the record does not show what they would have testified to or that they were available to testify at trial. Thus, we cannot determine how their testimony would have benefitted appellant's case. Ineffective assistance of counsel claims must be firmly founded in the record and not based on retrospective speculation. *See Bone v. State*, 77 S.W.3d 828, 835 (Tex. Crim. App. 2002). We conclude that appellant has not shown by a preponderance of the evidence that counsel's alleged "deficiency so compromised the proper functioning of the adversarial process that the trial court cannot be said to have produced a reliable result." *See Ex parte Martinez*, 330 S.W.3d at 901 (citing *Strickland*, 466 U.S. at 686).

### 3. Failure to Adequately Impeach Morales and Castillo

Appellant argues defense counsel was ineffective because he failed to adequately impeach Edward Morales and Conrado Castillo. However, "[t]he fact that the testimony may have been subject to impeachment . . . goes to the weight of the evidence and not to its admissibility." *Brown*, 270 S.W.3d at 568; *see* TEX. R. EVID. 609, 613. Even assuming defense counsel was deficient for failing to adequately impeach these two witnesses, we conclude appellant has not shown by a preponderance of the evidence that counsel's alleged "deficiency so compromised the proper functioning of the adversarial process that the trial court cannot be said to have produced a reliable result." *See Ex parte Martinez*, 330 S.W.3d at 901 (citing *Strickland*, 466 U.S. at 686).

### 4. Failure to Develop a Theory of Defense

Appellant argues defense counsel was ineffective because he failed to develop any theory of defense to create a sound trial strategy. There was no evidence placing

appellant at or near the scene of the Segrest shooting. Therefore, the State's case was that appellant, as a Mexican Mafia captain, planned and ordered the murder of Danny Villarreal. In an effort to counter the State's theory of criminal liability, defense counsel elicited the testimony of appellant as well as appellant's wife and son to show that: (1) appellant was neither a Mexican Mafia member nor a Mexican Mafia captain; (2) appellant did not plan Villarreal's murder; and (3) appellant did not order Villarreal's murder. This is a sound and valid trial strategy based upon the facts of this case. Furthermore, there was no evidence that the testimony of any additional witnesses would have benefited appellant. We conclude defense counsel's performance fell within the range of professional competence. Therefore, appellant has failed to prove ineffective assistance of counsel pursuant to *Strickland*.

### 5. Failure to Object to Hearsay Testimony

Appellant argues defense counsel was ineffective for failing to object to Conrado Castillo's hearsay testimony. He refers to several instances where the prosecutor, without any objection from defense counsel, elicited hearsay testimony from Castillo.

### a. Background

Castillo testified that on the date in question, he received a call from two Mexican Mafia members, Gilbert Castro and Joe Maldonado,[17] who told him, "[W]e just took care of business over here in Corpus." Maldonado did not tell Castillo what he meant by "business," but said they were "stranded at North Beach" and needed a ride. Afterwards,

---

[17]Castillo testified that Joe Maldonado is a Mexican Mafia member.

27

Castillo called Jody Acosta,[18] who offered to pick them up. Castillo testified that while he was at Maldonado's house in Taft, "I was . . . first aware of . . . [t]he death of Mr. Villarreal, Danny." He said that Maldonado and Castro "were scared, . . . because they said that when they were shooting, that they could hear the little kids [Cyr's children] crying." When Castillo's cousin, Reynaldo Castillo,[19] heard that the children were crying, he reminded them that Mexican Mafia rules do not allow gang members to hurt innocent bystanders and decided to call appellant "to see what's going on."[20] During this conversation, Reynaldo and appellant set up a meeting for the next day at Castillo's home. At that meeting, Anthony Gonzales and Humberto Garcia started "bragging about what they had done, . . . chopping down [Cyr's] house. . . ." Another gang member, "Alex," asked appellant, "'Hey, well did you know that it's against the rules and regulations of the Mexican Mafia to shoot, . . . innocent people or kids, especially kids?'"

### b. Analysis

Even assuming that defense counsel was deficient for failing to make hearsay objections to the aforementioned testimony, the hearsay does not directly implicate appellant either in the murder of Villarreal or the aggravated assault on T.R. Other non-hearsay testimony linked appellant to the offenses. We therefore conclude appellant has not shown by a preponderance of the evidence that counsel's alleged "deficiency so compromised the proper functioning of the adversarial process that the trial court cannot be said to have produced a reliable result." *See id.* (citing *Strickland*, 466

---

[18]Castillo testified Jody Acosta is a Mexican Mafia member.

[19]Castillo testified Reynaldo Castillo is a Mexican Mafia member.

[20]Castillo did not testify about anything that was said between Reynaldo Castillo and appellant that would implicate appellant either in Villarreal's murder or the aggravated assault on T.R.

U.S. at 686).

**6. Failure to Object to Improper Extraneous Bad Act, or Obtain a Limiting Instruction**

Appellant argues defense counsel was ineffective for failing to object to the testimony of Officer Milo Loa "regarding an alleged 'hit' on the Chief of Police of Corpus Christi." We note that Officer Loa, a State's rebuttal witness, did not testify that appellant ordered any "hit" on the police chief, or that he threatened the police chief. Nevertheless, even assuming defense counsel was deficient for failing to object to Loa's testimony, or request a limiting instruction, the prejudice prong of *Strickland* requires an appellate court to "look to the totality of the circumstances and evidence presented to determine if there is a reasonable probability that, but for [c]ounsel's deficient performance, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

We conclude the record does not support the conclusion that appellant met the second prong of the *Strickland* test. Even though the evidence did not show that appellant was one of the shooters, the evidence did show he planned and ordered Villarreal's murder and that the gangsters who carried out this plan wounded T.R. in the process. We cannot say that there is a reasonable probability that the outcome would have been different if defense counsel had either objected to, or requested a limiting instruction with regard to Officer Loa's testimony.

**7. Failure to Object to Jury Charge or Request an Accomplice Jury Instruction**

Appellant argues defense counsel was ineffective for failing to object to the jury charge and by not requesting an accomplice jury charge regarding Conrado Castillo's

29

testimony.

### a. Applicable Law

"A State's witness may be an accomplice as a matter of law or as a matter of fact." *Smith*, 332 S.W.3d at 439. "The evidence in each case will dictate whether an accomplice as a matter of law or fact instruction is required." *Id.* When "there is no doubt" that a witness is an accomplice as a matter of law, the trial court must instruct the jury accordingly. *Id.* "A witness who is indicted for the same offense or a lesser-included offense as the accused, is an accomplice as a matter of law." *Id.* When there is doubt concerning whether a witness is an accomplice (i.e., the evidence is conflicting), then the trial court may instruct the jury to determine a witness's status as a fact issue. *Id.* at 439-440. However, "when the evidence clearly shows that a witness is not an accomplice, the trial judge is not obliged to instruct the jury on the accomplice witness rule—as a matter of law or fact." *Id.* at 440.

### b. Analysis

We previously held that Conrado Castillo was not an accomplice. Furthermore, he was not indicted for the same offense or a lesser-included offense as appellant. Thus, the trial court was not required to instruct the jury, and defense counsel's failure to object to the charge and request an accomplice jury instruction did not constitute deficient performance. We conclude appellant has failed to satisfy the first prong of *Strickland*. Issue one is overruled.

## III. CONCLUSION

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
16th day of June, 2011.